UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60209-CR-DIMITROULEAS/SELTZER

UNITED STATES OF AMERICA

vs.

KENNETH C. JENNE,

      Defendant.

_____/

**UNITED STATES' SENTENCING MEMORANDUM AND OPPOSITION TO
DEFENDANT KENNETH C. JENNE'S REQUEST FOR LENIENCY**

      The United States, by and through the undersigned Assistant United States Attorneys, hereby

files this memorandum containing its sentencing recommendation and its opposition to defendant

Kenneth C. Jenne's request for leniency.  For the reasons stated below, the Court should sentence

the defendant to 24 months imprisonment, the top of his properly-calculated advisory Sentencing

Guidelines range.  The Court should find as well that a sentence of 24 months is reasonable in this

case under the sentencing factors of 18 U.S.C. § 3553(a).

      In this case, the top law enforcement officer of Broward County gravely breached the public

trust.  When the law is broken by one sworn to uphold it, all of society is harmed.  That harm

increases exponentially where, as here, the lawbreaker is not only a law enforcement officer but the

chief law enforcement officer of the largest sheriff's office in Florida.  Crimes like Jenne's

undermine the public's confidence in institutions of government and unfairly tarnish all of those who

serve their communities with honor and integrity.  This harm, combined with the need to deter others

who would seek to use public office for private gain, warrants a significant sentence.  Accordingly,

the United States recommends that the Court reject the defendant's request for a downward variance

1

and asks instead that the Court impose a sentence of 24 months imprisonment.

**BACKGROUND**

As is reflected in the Presentence Investigation Report (PSI) in greater detail, Jenne repeatedly used his public position as Sheriff of Broward County for his own private gain. More specifically, Jenne conspired with others to receive money from two vendors of the Broward Sheriff's Office (BSO) by making false representations concerning the ultimate destination of money that Jenne asked these vendors to give to his two secretaries. PSI at ¶8. Jenne concealed the fraud by, among other things, making false, misleading and incomplete statements in public filings and to investigators. Id.

This fraud was not the only improper conduct engaged in by Jenne during his time as Sheriff. Rather, the fraud was part of a larger and disturbing pattern of activity through which Jenne attempted to use his position as Sheriff of Broward County for his own personal financial gain:

● In 2001, Jenne received $8,130 worth of free demolition work from a BSO landlord during the same time period that he signed a lease with that landlord committing BSO to rent space in two of the landlord's buildings. Id. at ¶¶11-17.

● In 2002, Jenne received $10,000 from the same BSO landlord (funneled through a third party) to compensate Jenne for work he did advising the landlord on an investment into a chemical company. Id. at ¶¶19-24.

● Also in 2002, Jenne partnered with a BSO vendor to offer private consulting services to the Government of the Bahamas regarding the country's prison system. As part of the effort to land the consulting project, Jenne sent BSO employees to the Bahamas on BSO time to do a preliminary assessment of the prison system and, on a separate occasion, had on-duty BSO

employees give a tour of the Broward County Jail to a high-ranking Bahamian official.  Id. at ¶¶37-41.

- In 2003, in exchange for virtually no work, Jenne billed and collected $60,000 in consulting fees from a security company involved in the development of the Seminole Hard Rock Hotel and Casino.  During the same time period that Jenne billed the security company, Jenne directed that two BSO detectives brief executives from the security company on the status of BSO's investigation into the shooting of the Seminole Tribe's general counsel.  Id. at ¶¶59-62, 68.

- In 2004, Jenne received $4,000 from a BSO vendor for assistance in finding off-duty BSO deputies to teach a course in the Bahamas for the vendor.  Id. at ¶¶42-46.

- Also in 2004, contrary to the usual BSO policy and practice, Jenne directed that his two secretaries be permitted to cash out a combined total of $21,000 in accrued sick leave.  Jenne did so knowing that the two secretaries planned to give him the net proceeds.  Id. at ¶¶81-86.

In addition, Jenne made and subscribed false income tax returns for tax years 1998 through 2006.  Not only did Jenne fail to report the $25,500 in proceeds that he obtained from his fraud, he also failed to report loan and insurance payments made for his benefit on a Mercedes convertible, and failed to report the $18,130 in additional payments and benefits that he received from the BSO landlord.  Id. at ¶¶18, 24, 52, 58, 77.

**DISCUSSION**

**I.    The Sentencing Factors in 18 U.S.C. § 3553(a) Support a 24-Month Sentence.**

Taking into account both the Sentencing Guidelines and the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States recommends that this Court sentence Jenne to 24 months

imprisonment, which is the top end of his advisory Guidelines range.[1]  Only a sentence of this length adequately captures the seriousness of Jenne's misconduct and will sufficiently deter others from committing similar crimes.  The United States recognizes, of course, that the Sentencing Guidelines are now advisory, United States v. Booker, 543 U.S. 220, 245 (2005), and that "a district court is permitted to vary from those guidelines in order to impose a sentence which fits the mandate of [§] 3553(a)."  United States v. Collington, 461 F.3d 805, 808 (6th Cir. 2006).  Nonetheless, even after Booker, the advisory Sentencing Guidelines remain an important (and indeed mandatory) consideration.  The Eleventh Circuit has emphasized that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." United States v. Scott, 426 F.3d 1324, 1330 (11th Cir. 2005).  As the Supreme Court itself recently held, the Guidelines generally can be assumed to be a "rough approximation" of a sentence that would "achieve § 3553(a)'s objectives."  Rita v. United States, 127 S. Ct. 2456, 2458 (2007).

Here, a sentence of 24 months imprisonment, which is at the top end of the defendant's properly-calculated advisory Guidelines range, is fully consistent with the sentencing factors identified in § 3553(a).  The statute requires a court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1)  It also instructs the court to consider the need for the sentence imposed –

_____

[1]The plea agreement filed in this case contains the parties' joint recommendation that Jenne's applicable advisory Guidelines range should be 18 to 24 months.  The PSI instead grouped the four counts of conviction improperly and miscalculated the sentencing range to be 12 to 18 months.  In a separate pleading filed without opposition from the defendant, the United States has objected to the calculations in the PSI and has asked this Court to effectuate the agreement of the parties by calculating the proper advisory Guidelines range to be 18 to 24 months.  In the event the Court denies this request, the United States hereby asks the Court to vary upwards from the advisory Guidelines range to arrive at the requested 24-month sentence.

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In this case, the offense was undeniably serious in scope. Although the ultimate amount of money that Jenne obtained through his fraud was relatively low, Jenne obtained those amounts from victims who were vendors of the public law enforcement agency that he ran. It is one thing to defraud victims of money; it is quite another to use the imprimatur of one's high-ranking public office to help further the scheme. It is more egregious yet where, as here, the public office is that of Sheriff, the top law enforcement officer in the county. Put another way, the victims in this case are not just the vendors who were defrauded by Jenne into thinking they were giving money to his secretaries when the money was instead going to him. Rather, the victims include the citizens of Broward County, who were betrayed by a man elected to serve their interests and not his own, a man who subverted the oath he swore to uphold and defend the law.

What's more, as described more fully above and in the PSI, the fraud was but one example of Jenne's misuse of his public office for private gain. This was no aberration, no isolated event. To the contrary, beginning as early as 2001, a mere three years into his tenure as Sheriff, Jenne was already receiving benefits from BSO vendors that he failed to report on his federal income taxes or disclose on his annual ethics forms. Time after time, year after year, Jenne gained undisclosed private financial benefits from his position as Sheriff.

The manner in which Jenne carried out the fraud and other misconduct is also telling. Jenne's acts cannot be defended as mere failures to file appropriate disclosure forms or chalked up to an inability to understand the rules governing federal income tax.  Jenne, an attorney who spent nearly his entire career in public life, was no stranger to the rules governing conflicts of interest. He knew full well that the acts he was engaged in were improper and illegal.  This knowledge is evident from the repeated surreptitious means he employed in conducting these private business dealings:

- Jenne asked BSO vendors to give the money to Jenne's secretaries rather than directly to Jenne because he knew that accepting money from a BSO vendor was improper.  PSI at ¶¶27, 49.

- Jenne took the additional step of specifically instructing his secretaries to convert checks into cash before depositing them into his bank accounts, thereby attempting to conceal the source of the money.  Id. at ¶49.

- Jenne directed the attorney incorporating Havloc for him to form the company in such a way as to prevent Jenne's name from being publicly associated with the company.  Id. at ¶64.

- When Jenne wanted to transfer money from Havloc to his personal bank accounts, he did not do so directly.  Instead, on multiple occasions, he directed the bank to first transfer money from the Havloc account to the account of Knodishall Trading (a separate company that Jenne had formed to conduct his private business ventures) and then to transfer the money from Knodishall Trading to his personal bank account.  Id. at ¶73.

- In 2005, during the pendency of the criminal investigation, Jenne was contacted by his former law firm and told that the title to the Mercedes needed to be transferred into his name. Jenne asked that the title remain in the name of the law firm, a request that the law firm granted.  Id.

at ¶77.

●     In 2006, also during the pendency of the criminal investigation, Jenne gave his former law partner a redweld of documents to "hold" for him.  Although Jenne told his former law partner that the documents related to a new joint venture in which Jenne was not involved, the documents in fact related to the series of Jenne's private business transactions with BSO vendors that were at the center of the criminal investigation.  Id. at ¶80.

The overwhelming majority of public officials are honest and law-abiding.  Those few that are not, however, dominate the public's consciousness.  The sentence imposed in this case must be sufficient to help restore public confidence in government and to deter others who might be tempted to profit from the public trust.  Both the public at large and public officials in particular must understand that serious illegal behavior leads to serious jail time, no matter how powerful or well-connected a defendant may be.  Unlike run-of-the-mill cases that receive little attention outside of the participants involved, an appropriately lengthy sentence in a case like this one can have a powerful deterrent effect.  Accordingly, the United States asks this Court to sentence Jenne to 24 months incarceration, a sentence that will fully vindicate the purposes of sentencing as expressed in 18 U.S.C. § 3553(a).

## II.    Jenne's Arguments for Leniency Are Unconvincing.

Jenne makes several meritless arguments under 18 U.S.C. § 3553(a) in an effort to secure a lighter sentence.[2]  First, conveniently neglecting to mention the repeated acts of misconduct detailed in the PSI, Jenne argues that he deserves a lower sentence because his crimes were

---

[2]Jenne never says what he thinks the sentence should be, although he apparently believes it should be limited to one that does not include incarceration.

somehow the product of "aberrant behavior."  <u>See</u> Motion for Departure from Advisory Guidelines at 3-4.  This argument should be summarily rejected.  Behavior should not be considered "aberrant" for sentencing purposes unless the crime is a single spontaneous and thoughtless act rather than one that was the result of substantial planning.  <u>United States v. Withrow</u>, 85 F.3d 527 (11th Cir. 1996); <u>United States v. Pickering</u>, 178 F.3d 1168 (11th Cir. 1999) (holding that four robberies over four month period were not aberrant acts).  Here, Jenne's conduct continued not just over a period of months, but over a period of years.  In fact, from the day that Jenne was sworn in as Sheriff in 1998 to the day he resigned in 2007, he was receiving an undisclosed benefit in the form of payments made by a BSO vendor on the Mercedes he was driving.  Moreover, the PSI amply details Jenne's involvement in scheme after scheme in which Jenne used his public office to advance his private business and financial interests – the $8,130 worth of demolition work received from a BSO landlord; the $10,000 from the same landlord for work related to the chemical company; the $20,000 obtained from the landlord by way of Jenne's secretary; the attempted consulting venture in the Bahamas with a BSO vendor; the receipt of a combined $9,500 from that same vendor for assistance in providing access to off-duty deputies on three separate occasions; the $60,000 in "consulting fees" he received for performing virtually no work; and the combined $14,218 he received as a result of permitting his secretaries to cash out their sick leave contrary to usual BSO policy and practice.  This pattern of behavior, which extended over a period of years, is anything but aberrant.

Second, and perhaps most brazenly, Jenne argues that his sentence should be reduced due to his extraordinary acceptance of responsibility.  <u>See</u> Motion for Departure from Advisory Guidelines at 5.  This is a preposterous argument.  During the two years plus of this investigation, Jenne did everything in his power to delay his inevitable day of reckoning.  When initially

interviewed by investigators back in May 2005, Jenne was asked why there was a deposit of $20,000 into his bank account from one of his secretaries.   Rather than disclose that the funds were improperly obtained from a BSO landlord, Jenne lied to the investigators and told them that he had no recollection of receiving the money and would "have to check."  PSI at ¶30.  The very next day, Jenne spoke with his secretary about the need to repay the $20,000.  Id.  From that point forward, Jenne proceeded to fight the investigation full bore, even going so far as to hire outside counsel to represent BSO at rates ranging up to $650 per hour to respond to subpoenas (a figure well beyond the $125 maximum hourly rate that BSO generally permits its outside counsel to charge).  Jenne agreed to plead guilty only on the eve of a pending indictment, when a guilty plea was his least bad option.  Had Jenne truly wanted to spare the citizens of Broward County and the law enforcement community "disarray and partisan confusion" as he claims, Motion for Departure from Advisory Guidelines at 5, he would have done the right thing and accepted responsibility from the beginning. Instead, he forced investigators and prosecutors to pursue him for over two years, all the while incurring significant costs for both the investigative agencies and BSO.

        Third, Jenne submits that the loss of his reputation, combined with the potential loss of his law license and pension, warrant a sentence lower than the 18-24 months called for by the advisory Sentencing Guidelines.  See Motion for Departure from Advisory Guidelines at 6-8.  This argument is unavailing.  Just because Jenne had farther to fall than most defendants doesn't mean that he does not deserve to serve an appropriate sentence of incarceration.  Whether Jenne loses his law license and/or his pension is not for this Court (or, for that matter, the United States) to decide, but rather are issues that will be resolved by the Florida Bar and the Pension Board, respectively.  These are collateral and as of yet unresolved issues that do not bear on the resolution of his criminal case.  As

for Jenne's shattered reputation, that is but one of the unfortunate consequences that has resulted from Jenne's felonious conduct. But the argument that the loss of his reputation is punishment enough should not be countenanced. Loss of reputation is not punishment enough. If it were, then no high-ranking public official would ever have to face prison time as a consequence for his criminal acts. In this case, given the totality of Jenne's conduct, a sentence of 24 months imprisonment is the appropriate and reasonable sanction.

Fourth, Jenne contends that he should receive a lighter sentence because of his high prospects of rehabilitation. See Motion for Departure from Advisory Guidelines at 8-9. The United States does not dispute that Jenne has the potential to be rehabilitated. But this merely renders him similarly situated to many other white-collar criminals. There is nothing extraordinary about Jenne's potential for rehabilitation that qualifies him for a lower sentence.

Fifth, Jenne makes the somewhat surprising argument that the advisory Guidelines range overrepresents the seriousness of his offense. See Motion for Departure from Advisory Guidelines at 9-12. If anything, the contrary is true. As the PSI details, Jenne's advisory Guidelines range was calculated based on the tax loss resulting from his offense and does not take into account the fact that, at the time he filed false tax returns, he happened to be the chief law enforcement officer of Broward County. See PSI at ¶94. The true seriousness of Jenne's crime is not adequately measured by merely calculating the number of dollars that went missing from the public fisc. Rather, Jenne's conduct was egregious precisely because of who he was and what he was trying to do – he was the Sheriff of Broward County and he was trying to conceal his business dealings with BSO vendors. The income that Jenne failed to report was income that he could not safely report without risking disclosure of his myriad improper conflicts of interest. Because his annual ethics filings required

him to disclose his federal income tax return (or, alternatively, to itemize all sources of income individually), Jenne knew that any extra income reported on his tax returns would prompt questions from reporters once the returns were filed publicly as part of his annual ethics disclosures. As a result, he left the illicit income off his tax returns, thus hoping to ensure that the public would never know that he had misused his public office for private gain.

Sixth, Jenne argues that he deserves a lower sentence based on his extraordinary and lengthy public service activities. See Motion for Departure from Advisory Guidelines at 13-18. Jenne's history of public service in no way excuses his crimes. It is true that Jenne is a career politician who served Broward County for a lengthy period of time. This status, however, does not qualify him for a lesser sentence. In a way, Jenne's long tenure as a public official, and the familiarity that tenure gave him with the laws governing such officials, makes his transgressions worse. As a longtime public official, Jenne of all people should know the importance of being above reproach. Whereas someone new to public life might make an error in judgment, Jenne's familiarity with the strict rules governing public officials makes his actions here all the more egregious. The fact that, in the past, Jenne served the people of Broward County well is undisputed. But that past service does not excuse the enormity of his misconduct as Sheriff. Moreover, the many letters of support submitted on Jenne's behalf appear, at least in part, to be the result of a cynical and artificially orchestrated letter-writing campaign. See Email from Candace Hartsell (Jenne's former Deputy Chief of Staff at BSO) dated November 2, 2007, attached hereto as Exhibit A.

Seventh, Jenne submits that a reduced sentence is appropriate because he has exhibited extreme remorse for his actions and has made restitution to the IRS. See Motion for Departure from Advisory Guidelines at 18. While Jenne may have "taken and accepted total responsibility" for his

actions now that he has pled guilty and is facing sentencing, <u>id.</u>, he did so only after fighting the investigation for two years.  And while he may indeed be remorseful over his current predicament, his remorse was nowhere in evidence during that two-year period.  The fact that now, on the eve of his sentencing hearing, Jenne has displayed remorse is not surprising.  But this remorse does not qualify him for a lower sentence.  In addition, the payment of restitution to the IRS was a condition of the plea agreement and in no way renders Jenne deserving of a lower sentence.  <u>See</u> Plea Agreement at ¶ 9.

Eighth and finally, Jenne argues that even if none of his seven arguments were to warrant a lower sentence in isolation, they do so in combination.  <u>See</u> Motion for Departure from Advisory Guidelines at 18-19.  Unfortunately for Jenne, the combination of seven meritless arguments does not result in a meritorious one.  Seven times zero is still zero.  Whether considered in isolation or in combination, the arguments offered by Jenne do not support leniency.

## CONCLUSION

Jenne was the top law enforcement officer of Broward County.  But rather than keep his solemn vow to uphold and enforce the law, he breached the public trust by engaging in multiple criminal acts.  In so doing, Jenne not only destroyed his own reputation, but stained the good names of honest, hard-working, and dedicated public servants everywhere.  By his actions, Jenne has directly contributed to the erosion of the public's confidence in its leaders and its government.

For these reasons, and those expressed above, this Court should sentence Jenne to 24 months imprisonment.  This sentence is not only consistent with the top end of his properly-calculated advisory Guidelines range, but reasonable in this case under the factors of 18 U.S.C. § 3553(a).

Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

By:   s/ Matthew S. Axelrod
Michael Patrick Sullivan
Fla. Bar No. 134814
Matthew S. Axelrod
Court ID No. A5500771
Assistant United States Attorneys
99 N.E. 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9021
Fax: (305) 536-7213

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 15, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

s/ Matthew S. Axelrod
Matthew S. Axelrod
